UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

KUMARI GHAFOOR-DAVIS,                          :
                  Plaintiff,             :
                                     :
          v.                                         :    No.   5:24-cv-2640
                                     :
COMMUNITY ACTION LEHIGH VALLEY,                 :
                  Defendant.             :

_____

**O P I N I O N**

**Community Action Lehigh Valley's Motion for Summary Judgment, ECF No. 19 –
Granted in part, Denied in part**

**Joseph F. Leeson, Jr.**                                                        **February 4, 2025**
**United States District Judge**

## I.    INTRODUCTION

      Kumari Ghafoor-Davis was employed by Community Action Lehigh Valley ("CALV")

as the organization's Campaign for Racial and Ethnic Justice Director for five years.  At several

points in her tenure, Ghafoor-Davis was at odds with CALV's leadership.  This tension existed

between her and the Executive Directors and between the Executive Directors and her team.  In

2023, she was placed on a Performance Improvement Plan ("PIP") and ultimately fired.  In this

suit, Ghafoor-Davis alleges that this strife was the product of racial animus.  In particular,

plaintiff alleges the purported racial animus of CALV's current and former Executive Directors

Dawn Godshall and Alan Jennings, respectively.  She now brings claims for racial

discrimination, harassment, and retaliation.

## II.    BACKGROUND

### A.    Undisputed Facts[1]

CALV is an anti-poverty non-profit serving the people of the Lehigh Valley.  Beginning in 2018, Kumari Ghafoor-Davis, an African American woman, worked for CALV as its Director for the Campaign of Racial and Ethnic Justice ("CREJ").  At the time Ghafoor-Davis was hired, she reported to Dawn Godshall, the Associate Executive Director for Community Services. Godshall is a bi-racial woman who identifies as black.  In 2019, Godshall was promoted to Deputy Executive Director and then in 2021, to Executive Director.  Before Godshall was promoted to Executive Director, Alan Jennings, a white man, held the title from approximately March of 1990 until May of 2021.

As Director of CREJ, Ghafoor-Davis was tasked with implementing and administering three programs: 1) the Color Outside the Lines ("COTL") program; 2) the SHE program; and 3) Generation Next.  These programs were generally designed to address wealth, gender, and racial disparities in the Lehigh Valley across a number of different facets including employment, mental health, and education.  In her role as Director, Ghafoor-Davis led the team of employees who ran these programs.  While the team consisted of both people of color and white people, it was predominantly staffed with people of color.  ECF No. 20-6 at 43:16-47:4.

At various times during her employment with CALV, Ghafoor-Davis was involved in work conflicts.  One source of conflict was Alan Jennings.  Ghafoor-Davis often complained that Jennings was racist.  ECF No. 20-5 at 35:19-36:6.  Jennings testified that he wanted to fire Ghafoor-Davis but could not out of fear he would be branded a racist in the community.  *Id.* at

---

[1]    The undisputed facts are taken from the CALV's Statement of Material Facts, *see* ECF No. 21, as admitted by **Ghafoor-Davis**, *see* ECF No. 23.  Any facts not taken directly from the CALV's Statement of Material Facts are identified herein with citation to the record.

38:21-39:21. Jennings also testified that he would later encourage Godshall to fire Ghafoor-Davis after he left CALV's employ. *Id.* at 39:5-39:24.

One particular episode involves a July 29, 2020, email in which Ghafoor-Davis sent Jennings an article titled "White Supremacy Culture Characteristics." In that email, Ghafoor-Davis informs Jennings that the CREJ team uses the article in her trainings and expresses a hope that "we can work together to avoid having a white supremacy culture in our policies and procedures." ECF No. 20-9. Eight months later, on April 1, 2021, Jennings forwarded the email to Godshall with Ghafoor-Davis cc'd. In the forwarded email, Jennings states:

> Apparently, Dawn, Kumari is concerned that you are going to be a hood-wearing white supremacist executive director. I hope you can do all you can to make sure that those hoods don't find their way out of the closet.
>
> Alan Jennings
>
> Grand Wizard

*Id*. Ghafoor-Davis referred to the email as "childish" in a private email to Godshall shortly thereafter. *Id.*

Another source of conflict was Ghafoor-Davis's working relationship with Godshall. In 2019, when Godshall was Ghafoor-Davis's supervisor, Godshall conducted a performance appraisal of Ghafoor-Davis's work which, while generally positive, was critical of her organization skills. ECF No. 20-8, at 5. On August 5, 2021, Godshall wrote a Corrective Counseling memorandum for Ghafoor-Davis in which she criticized Ghafoor-Davis's organization and time-management skills. ECF No. 20-10. In particular, Godshall took issue with the timeliness of Ghafoor-Davis's Director's Reports, the reconciliation of her credit card, and her general budget management. *Id*. When she wrote this memorandum, Godshall was serving as the Executive Director and was not Ghafoor-Davis's immediate supervisor. Ghafoor-

Davis responded with a rebuttal in which she disputed the issues identified in the memorandum. *See* ECF No. 20-20.

Central to this litigation is the verbal criticism Godshall levied at Ghafoor-Davis, both to her person and to others within the organization and in the community. While the nature and extent of this criticism is sharply contested, the record at least shows that Godshall, at times, referred to Ghafoor-Davis and her team as "too close," ECF No. 20-12 at 129:12-14, "unorganized," *Id.* at 120:5-6, "a cult," *Id.* at 8:17-20, "a hot mess," *Id.* at 159:11-12, and stated that nobody would touch the CREJ program with a "ten foot pole." *Id.* at 127:24-128:4.

Ghafoor-Davis was placed on a Performance Improvement Plan ("PIP") on March 20, 2023. *See* ECF No. 20-14. The PIP was predicated upon Ghafoor-Davis's organization and time management skills. *Id.* Among the issues identified was Ghafoor-Davis's continuously late submissions of her monthly reports. *Id.* The PIP was signed by both Ghafoor-Davis and Jaana Kelley, Ghafoor-Davis's immediate supervisor and the Associate Executive Director of Community Services. *Id.* While the parties dispute the nature of Godshall's involvement in the PIP, the parties agree that she was at least aware of its issuance.

Not long after, Ghafoor-Davis's employment with CALV was terminated on May 12, 2023, following a meeting with Kelley, Jessica Reimert (CALV's then Deputy Executive Director for Operations), and Elesia Fowlin (CALV's then Associate Executive Director for Human Resources). While the true reason for Ghafoor-Davis's termination is at the center of this litigation, her termination at least coincides with a breakdown in the funding of a CREJ program administered with the Bethlehem Area School District.

### B.    Procedural History

On July 27, 2023, Ghafoor-Davis filed a charge of discrimination with the EEOC and the PHRC.  On June 17, 2024, Ghafoor-Davis filed a Complaint alleging racial discrimination, harassment, and retaliation arising under Title VII, the PHRA, and Section 1981.  *See* ECF No. 1.  On December 23, 2024, CALV filed the instant Motion for Summary Judgment.  *See* ECF No. 19.  The matter is now fully briefed and ready for disposition.  For the reasons that follow, the Motion is granted in part and denied in part.

## III.    LEGAL STANDARDS

### A.    Rule 56 – Summary Judgment – Review of Applicable Law

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 257.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The party opposing the motion must produce evidence to show the

existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The court must consider the evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

     **B.**     **Title VII – Racial Discrimination – Review of Applicable Law**

Federal law prohibits employment discrimination based on race, color, religion, sex, national origin, age, and disability. *See E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 448-49 (3d Cir. 2015). Disparate treatment claims brought under Title VII are analyzed using the three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Rabinowitz v. AmeriGas Partners, L.P.*, 252 F. App'x 524, 527 (3d Cir. 2007). "Under the McDonnell Douglas paradigm, an employee must first establish a prima facie case of discrimination, after which the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision." *Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005). The Third Circuit Court of Appeals has "defined 'an adverse employment action' under Title VII as an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)). "If the employer articulates one or more such reasons, the aggrieved employee must then proffer evidence that is sufficient to allow a reasonable finder of fact to find by a preponderance of the evidence that the employer's proffered reasons are false or pretextual." *Id.*

"It is important to note that although the burden of production may shift during the McDonnell Douglas inquiry, the ultimate burden of persuading the trier of fact that the

[employer] intentionally discriminated against the [employee] remains at all times with the [employee]." *Id. See also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (explaining that once the plaintiff establishes a prima facie case, the law creates a "presumption" of unlawful discrimination, which is rebutted if the employer articulates a legitimate nondiscriminatory explanation for the employer's action, but the "presumption does not shift the burden of proof, and ignores our repeated admonition that the Title VII plaintiff at all times bears the ultimate burden of persuasion").

To establish a prima facie case of employment discrimination, a plaintiff must show that:

(1) he is a member of a protected class;

(2) he was qualified for the position in question;

(3) he suffered an adverse employment action; and

(4) the adverse action occurred under circumstances giving rise to an inference of discrimination.

*See McDonnell Douglas Corp.*, 411 U.S. at 802; *see also Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). "The central focus in a discrimination case is "whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15. (1977)).

### C.    Title VII – Hostile Work Environment - Race

To establish a hostile work environment claim, the plaintiff must show:

1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability.

*Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).  In deciding whether an environment is "hostile," the court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993).  Title VII "does not reach the ordinary tribulations of the workplace, for example, sporadic use of abusive language or generally boorish conduct." *Vance v. Ball State Univ.*, 570 U.S. 421, 452 (2013) (internal quotations omitted).  "'[O]ffhanded comments and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005).  The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  A plaintiff claiming a hostile work environment based on regular and pervasive harassment must likewise establish that any harassment was due to her membership in a protected class or protected activity.  *See Culler v. Sec'y of U.S. Veterans Affairs*, 507 F. App'x 246, 249 (3d Cir. 2012) (per curiam) (citing *Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007)).

### D.    Retaliation – Review of Applicable Law

Federal law prohibits an employer from retaliating against an employee for opposing any act made unlawful by the employment discrimination statutes or because the employee made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under the employment discrimination statutes. *See E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444 at 449. To establish a prima facie case of illegal retaliation, a plaintiff must show:

(1) protected employee activity;

(2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and

(3) a causal connection between the employee's protected activity and the employer's adverse action.

*See id.; Selvato v. SEPTA*, 658 Fed. Appx. 52, 56 (3d Cir. 2016) (internal quotations omitted). "With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." *Moore v. City of Phila*., 461 F.3d 331, 341 (3d Cir. 2006). "Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Id*. In the retaliation context, "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) "Once a plaintiff establishes a prima facie case, the burden shifts to the employer to advance a legitimate non-retaliatory reason for its conduct. If an employer advances such a reason, a plaintiff then must show that the proffered reason was a pretext for retaliation." *Estate of Oliva v. N.J., Dep't of Law & Pub. Safety, Div. of State Police*, 604 F.3d 788, 798 (3d Cir. 2010).

## IV.    ANALYSIS

### A.    Racial Discrimination

Ghafoor-Davis's racial discrimination claims are subject to the McDonnell-Douglas burden shifting framework.[2]  *See Rabinowitz*, 252 F. App'x at 527.  In its Motion for Summary Judgment, CALV contends only that Ghafoor-Davis has failed to establish a prima facie case, arguing that there exists no genuine issue as to whether any adverse action occurred under circumstances from which a reasonable juror could infer intentional discrimination. Accordingly, the Court's analysis is so limited.

Ghafoor-Davis's theory is that she was placed on a PIP and then terminated because of her race.[3]  This theory relies on the actions and purported racial animus of Dawn Godshall. However, CALV argues that Godshall (and her alleged racial animus) were not involved in those decisions.  Rather, CALV argues that the undisputed record shows that Reimert and Kelley were the ones who decided to place Ghafoor-Davis on the PIP and then fire her, not Godshall.  In support they cite the deposition testimony of Reimert, Kelley, Fowlin, and Godshall, all of which claim Godshall was not involved.  *See* ECF No. 20-3 at 29:3-7, 30:24-31:6; *see also* ECF No. 20-2 at 99:20-100:6; ECF No. 20-4 at 54:1-5; ECF No. 20-12 at 82:2-5; ECF No. 20-14. Accordingly, Godshall's racial animus could not have been a determinative factor in placing Ghafoor-Davis on the PIP or firing her.  *See Dey v. Innodata Inc*, CV No. 18-0978, 2022 WL 596977, at *5 (D.N.J. Feb. 24, 2022) (dismissing a claim for racial discrimination where there

---

[2]      Section 1981 claims "are subject to the same analysis as discrimination claims under Title VII."  *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017).  As are PHRA claims. *See Nagle v. RMA, The Risk Mgmt. Ass'n*, 513 F. Supp. 2d 383, 387 (E.D. Pa. 2007).

[3]      In her Complaint, Ghafoor-Davis alleges that CALV's failure to investigate her complaints of discrimination or apply it policies were also adverse actions.  Compl. ¶ 69. However, in her response, she appears to abandon these arguments by declining to rebut CALV's Motion on these points.  Resp. at 13 n.5.

existed no evidence that the individual who exhibited racial animus was involved in the plaintiff's termination).  Further, because Ghafoor-Davis does not allege Reimert or Kelley harbored any racial animus, Ghafoor-Davis's race could not have been a determinative factor in either adverse action.

Now, the burden shifts to Ghafoor-Davis to put forward evidence that a genuine issue exists on this point.  *See Celotex*, 477 U.S. at 324.

### 1.    Ghafoor-Davis has adduced no *direct* evidence of discrimination

In her response, Ghafoor-Davis argues that she has put forward direct evidence of discrimination.  The Court disagrees.  She is confusing direct evidence of racial animus with direct evidence of the sort of discrimination covered by Title VII.

"'Direct evidence of discrimination would be evidence which, if believed, would prove the existence of the fact [in issue] *without inference or presumption*.'"  *Torre v. Casio, Inc*., 42 F.3d 825, 829 (3d Cir. 1994) (quoting *Earley v. Champion Int'l Corp*., 907 F.2d 1077, 1081 (11th Cir.1990) (emphasis in original)).  "Only the most blatant remarks, whose intent could be nothing other than to discriminate *in reaching an employment decision*, are considered sufficient to constitute direct evidence of discrimination." *Weightman v. Bank of New York Mellon Corp*., 772 F. Supp. 2d 693, 702 (W.D. Pa. 2011) (emphasis added).  For instance, informing a job candidate they were not getting an open position "because she was going on maternity leave" is direct evidence where the statement causally links the employment decision (not getting the job) with the impermissible discrimination (the candidate's pregnancy).  *Chervenitski v. Cnty. of Luzerne Dist. Attorney's Off*., No. 3:06CV2041, 2008 WL 425561, at *2 (M.D. Pa. Feb. 14, 2008).  No inference is needed.

Here, the evidence offered is nowhere near as direct. In fact, Ghafoor-Davis's response lists six bullet points of "facts supporting [her] case that Ms. Godshall was a decision maker and/or was involved in the decision to terminate" her. Resp. at 9. Direct evidence does not need supporting inferences. As direct evidence, Ghafoor-Davis also cites a number of "race-based statements and actions" made by Godshall including calling Ghafoor-Davis and her team:

> "toxic," "too close," a "cult," "indoctrinating others," a "hot mess," "don't have their own minds," a "hot ass mess," "a low-level employee," "unorganized" a "shit show," "not having to speak to them because they were not on her level," that she and her team should "coddle White people"

Resp. at 3. While Ghafoor-Davis infers that these statements are "race based," none of them, save the last, even reference race. Instead, she is simply inferring that these comments are *subliminally* racial. That is not direct evidence where these statements are subject to a competing inference. For instance, there is another inference in which these comments should be taken at face value and reflect Godshall's feelings that Ghafoor-Davis's team was a poorly organized and headstrong unit.

**2.    Ghafoor-Davis has put forward a prima facie claim of discrimination supported by circumstantial evidence**

Rather, Godshall's involvement in placing Ghafoor-Davis on the PIP and then firing her is supported by circumstantial evidence. For at least two reasons, the Court finds that Ghafoor-Davis has established a genuine issue as to Godshall's involvement.

First, Ghafoor-Davis notes that, in the past, Godshall has reached down through the chain of command to discipline CALV employees. For instance, Godshall pressured Ghafoor-Davis to place one of the CREJ team members on a PIP. More importantly, on another occasion, Godshall issued a Corrective Counseling memorandum to Ghafoor-Davis despite not being her direct supervisor. This creates an inference that Godshall would be willing to discipline Ghafoor-Davis outside of the chain of command again. Second, Ghafoor-Davis notes that

Godshall had actively recruited her replacement on at least two occasions prior to her termination. *See* CSOF ¶ 123, 195. From these two points, a reasonable juror may infer that despite the denials of CALV employees, Godshall (and her purported racial animus) was indeed responsible for these adverse actions.

"[T]he prima facie requirement for making a Title VII claim 'is not onerous' and poses 'a burden easily met.'" *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The evidence adduced clears this threshold. Accordingly, the Court will deny summary judgment on the racial discrimination claims.

### B.    Racially Hostile Work Environment

Next, CALV argues that it is entitled to summary judgment where Ghafoor-Davis cannot establish the elements of a hostile working environment claim. In particular, CALV argues that Ghafoor-Davis cannot establish a genuine issue as to whether: 1) she suffered discrimination because of her race; 2) the discrimination was pervasive or severe; or 3) the discrimination detrimentally affected her and/or would detrimentally affect a reasonable person.

#### 1.    Based Upon Race

Ghafoor-Davis must first demonstrate that a reasonable juror could find that the harassment she experienced was based upon her race. The Court begins by outlining the conduct Ghafoor-Davis believes was harassing and then assesses whether a reasonable juror could conclude that the harassment was racial in nature.

##### a.    Alan Jennings

First, are the statements and conduct of Alan Jennings. Ghafoor-Davis directs the Court's attention to the April 1, 2021, email from Alan Jennings to Ghafoor-Davis and Godshall.

In that email, Jennings forwards along an email from Ghafoor-Davis which contains a link to an article titled, "White Supremacy Culture Characteristics." In the original email, Ghafoor-Davis tells Jennings that she and her team use the article in their community trainings and that she hopes the two "can work together to avoid having a white supremacy culture in [CALV's] policies and procedures." ECF No. 20-9. Jennings's April 1, 2021, email, forwarding the message some eight months later, references the Ku Klux Klan, writing that Ghafoor-Davis is concerned that Godshall will be a "hood-wearing white supremacist executive director" and encouraging Godshall to "make sure that those hoods don't find their way out of the closet" before signing off as "Grand Wizard." *Id.* Ghafoor-Davis also notes that Jennings undermined support for the CREJ programs by referring to her as an "unorganized radical" to those in the community "including partners in the COTL program." PSOF ¶ 146. In the same vein, Jennings referred to the COTL plan as "a black manifesto" in June of 2020. ECF No. 20-6 at 60:1-2; 62:14-63:17. Further, Ghafoor-Davis cites Jennings's testimony that he hired Ghafoor-Davis, in part, because she is black, *see* ECF No 20-5 at 59:13-16, and that he wished he could have fired Ghafoor-Davis but did not out of fear he would be called racist. *See id.* at 39:22-24. Lastly, after retiring from CALV, Jennings encouraged Godshall to fire Ghafoor-Davis. *See id.* at 40:1-12.

b.     Dawn Godshall

Second, Ghafoor-Davis alleges that Godshall carried on this "racially discriminatory" conduct by calling Ghafoor-Davis unorganized, a "hot ass mess," cultlike, toxic, and too close. Resp. at 20. Ghafoor-Davis also alleges that Godshall undermined CREJ programs by, *inter alia*, telling potential funders that people only care about dogs and kids but not race, *see* PSOF ¶

147, and that nobody would touch Ghafoor-Davis' CREJ programs with a "10-foot pole." *See id*. ¶¶ 149-155.

> c.    A reasonable juror could find this conduct was racial

> Racial discrimination in the workplace manifests itself in two forms, overt conduct and facially neutral conduct, either of which can support a plaintiff's claim for hostile work environment. *Cardenas*, 269 F.3d at 260–61. A plaintiff alleging discrimination through facially neutral conduct, however, must show some "surrounding circumstances that would expose the purportedly discriminatory nature of what is otherwise racially neutral conduct." *Brooks v. CBS Radio, Inc*., Civil Action No. 07–0519, 2007 WL 4454312, at * 12 (E.D.Pa. Dec.17, 2007).

*Martin v. Pachulski, Stang, Ziehl, Young & Jones, P.C.*, 551 F. Supp. 2d 322, 331 (D. Del. 2008).

In large part, Ghafoor-Davis offers facially neutral conduct. As noted, the verbal criticism of her organization skills or even the cultlike nature of her team are not overtly racial. Rather, Ghafoor-Davis *infers* their racial nature. The foundation of this inference is two-fold. First, Ghafoor-Davis reiterates that Godshall repeatedly stated that she felt more comfortable around white people than black. Second, Ghafoor-Davis relies upon *both* her subjective impressions and the subjective impressions of other CALV employees that Godshall and Jennings treated black employees differently than white employees.[4] *See* ECF No. 20-6 at

---

[4]    It is unclear how some of the other conduct cited would constitute racial *harassment*. For instance, the fact that Jennings hired Ghafoor-Davis, in part, because she is black does not fit neatly into the sort of conduct that ordinarily forms the basis of a hostile working environment claim. Similarly, Jennings's unacted upon desire to fire Ghafoor-Davis is not harassment. *See Aman v. Cort Furniture Rental Corp*., 85 F.3d 1074, 1087 (3d Cir. 1996) ("While Title VII does not prohibit racist thoughts, the law does require that employers prevent such views from affecting the work environment either by influencing employment decisions or creating a hostile work environment.") Nor can it be said that CALV created a racially hostile working environment based upon Ghafoor-Davis's complaints about Jennings. Rather, the Court considers this evidence insofar as it suggests Jennings's facially neutral conduct was actually racially tinted. Similarly, Ghafoor-Davis notes an incident in which CALV cancelled internal Cultural Humility trainings because two white employees complained. PSOF ¶¶ 126-134. If the implication is that Godshall was more attuned to the sensitivities of her white employees than her

191:8-13; ECF No. 28 at 109:1-17.  Whether these statements or attitudes are true is a question

of fact for a jury.  For now, Ghafoor-Davis has put forward sufficient evidence from which a

reasonable juror may infer the criticism of her and her team was racially tinted.

Similarly, both Jennings's and Godshall's undermining public statements about CREJ

programs are facially neutral.  Deeming the CREJ program "radical" or generally unpalatable to

the community is a criticism of the CREJ programs' *approach*, not the team's racial makeup.

However, what complicates this case is that the parties' work concerns matters of race.  The

parties share, at least nominally, a common goal.  Their work aims to combat racial prejudice in

the Lehigh Valley.  That is a complicated problem subject to complicated solutions — about

which reasonable minds may differ.  Disagreeing about the economics, administration, or

approach of Ghafoor-Davis's racial programs does not inherently shade the disagreement with a

racial animus.  Thus, it becomes necessary to carefully consider what statements or actions

occurred because of Ghafoor-Davis's *race* from what statements or actions occurred because of

her *approach to race* and racial problems.

However, that analysis is for a jury to determine.  At this stage, Ghafoor-Davis has

adduced some evidence which, if believed, would suggest Godshall is less comfortable with

black people and that both she and Jennings treated black employees different from white

employees.  It follows then that the undermining comments regarding the CREJ program, which

addresses race issues, may be shaped by those sentiments.  The extent of that influence is a

question of fact for a jury to decide.

---

black employees, that may be considered evidence of racial animus.  However, the Court fails to
see how merely cancelling Cultural Sensitivity training is racial *harassment*.

### 2. Severe or Pervasive

Nevertheless, the complained of harassment must still be so severe or pervasive that it altered the conditions of Ghafoor-Davis's employment and created an abusive environment. *See Faragher*, 524 U.S. at 788. Here, no reasonable juror could find that Ghafoor-Davis has met this standard.

The conduct complained of is certainly not severe. The comments are not racial epithets. *See Williams v. Mercy Health Sys.*, 866 F. Supp. 2d 490, 502 (E.D. Pa. 2012). Nor are they facially neutral terms which actually invoke racially charged stereotypes or prejudices. *See e.g. Carter v. PSEG Servs. Corp.*, 2024 WL 1956510, at *8 (D.N.J. May 3, 2024) ("it is axiomatic that referring to an African American man as 'boy' is akin to a racial slur.") Jennings's references to the KKK are perhaps the most serious comments. However, this is exactly the sort of "offhanded comment" which, even in the totality of these circumstances, is insufficient to support a claim. *See Stucke v. City of Philadelphia*, 685 F. App'x 150, 153 (3d Cir. 2017). Nor are the comments physically threatening or humiliating. *C.f. Onely v. Redner's Markets, Inc.*, 697 F. Supp. 3d 410, 429 (E.D. Pa. 2023) (finding threatening conduct where coworker pressed the plaintiff's views on racial unrest into an argument, cursed at the plaintiff, threw a cooking pan, and then stormed off in anger.)

Further, there exists little evidence the comments were frequent, let alone pervasive. A hostile working environment claim is not limited to severe conduct. Indeed, the relevant element of the test considers whether the conduct was "severe *or* pervasive." *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 286 (3d Cir. 2010) (emphasis added). Thus, an individual subject to a "thousand cuts" which themselves are not severe may still make out a claim for a hostile working environment. *See Onely*, 697 F. Supp. 3d at 428.

While, Ghafoor-Davis has not addressed the frequency of the "harassing conduct"

directly, the Court's review of the record indicates the following:

- Ghafoor-Davis claims racial harassment from Alan Jennings's April 1, 2021, email in which Jennings referenced the Klan. *See* Pl. Resp. at 19. The record reflects that this was a lone occurrence. *See* ECF No. 20-9.

- Ghafoor-Davis claims racial harassment where Alan Jennings referred to her as a radical. *See* Pl. Resp. at 20. While Jennings's testimony does not reflect the pervasiveness of this comment, *see* ECF No. 20-5 at 40:13-18, Ghafoor-Davis's deposition testimony indicates that Jennings made this characterization "so much that people in the office were talking about it." ECF No. 20-6 at 56:10-14.

- Ghafoor-Davis claims racial harassment where Godshall referred to her as "unorganized." *See* Pl. Resp. at 20; *see also* PSOF ¶ 110. The cited testimony to this effect does not indicate the frequency of this comment. *See* ECF No. 20-12 at 120:5-16. Candace Moody testified that she heard that comment "on a few occasions." ECF No. 29-2 at 128:12-15.

- Ghafoor-Davis claims racial harassment where Godshall referred to her team as "a cult." *See* Pl. Resp. at 20; *see also* PSOF ¶ 111. Godshall testified that she indeed did so on at least one occasion when discussing the team with Kelley and a team member's mother. *See* ECF No. 20-12 at 8:17-24. The testimony of Deja Wilson and Ghafoor-Davis corroborate that on Ghafoor-Davis's last day, Wilson told her that Godshall referred to the team as a cult. *See* ECF No. 20-6 at 93:4-21; ECF No. 29 at 45:1-7.

- Ghafoor-Davis claims racial harassment where Godshall referred to her team as "indoctrinating." PSOF ¶ 112. To this effect, she cites the testimony and written complaint of Deja Wilson who complained that Godshall referred to the REJ team as a "cult or an indoctrination of some type." ECF No. 24-9 at 2; ECF No. 29 at 134:3-17. There is no indication as to how often this statement was made or whether it was made on a different occasion than the "cult" comment.

- Ghafoor-Davis claims racial harassment where Godshall referred to her team as "too close." *See* Pl. Resp. at 20; *see also* PSOF ¶ 113. Ghafoor-Davis testified that she made this comment "all the time" and "the entire time." ECF No. 20-6 at 94:14; 185:6-12. Moody testified that Godshall made this comment "many times." ECF No. 29-2 at 27:18; *see also* ECF No. 20-12 at 129:12-130:12 (Godshall testifying that she called the CREJ team "too close.")[5]

---

[5]     The testimony of Deja Wilson and Robyn Weaver cited in PSOF ¶ 113 do not support the assertion.

- Ghafoor-Davis claims racial harassment where Godshall referred to her team as a "hot ass mess." *See* Pl. Resp. at 20; *see also* PSOF ¶ 114. In support, Ghafoor-Davis cites Candace Moody's testimony that this occurred on a singular occasion. ECF No. 29-2 at 52:19-53:7. Deja Wilson testified that this comment occurred once and on the day before Ghafoor-Davis was fired. ECF No. 29 at 30:12-31:7. Godshall testified that she called Ghafoor-Davis a "hot mess" to Kelley. ECF No. 20-12 at 159:11-15.

- Ghafoor-Davis claims racial harassment where Godshall referred to her team as "toxic." *See* Pl. Resp. at 20; *see also* PSOF ¶ 115. Moody testified that she heard Godshall use that term just once and in the same conversation in which Godshall told her the team was "too close." ECF No. 29-2 at 123:2-20. From the cited testimony of Ghafoor-Davis, it is unclear whether the term "toxic" was explicitly used. ECF No. 20-6 at 186:4-7.

- Ghafoor-Davis claims racial harassment where Godshall referred to her as a "low level employee." PSOF ¶ 116. The cited testimony does not indicate the frequency of this comment. *See* ECF No. 20-6 at 214:12-215:10; *see also* ECF No. 24-9; ECF No. 29-2 at 131:19-23; ECF No. 29 at 74:21-23.

- Ghafoor-Davis claims racial harassment where Godshall "repeatedly" rolled her eyes at her. PSOF ¶ 117. The cited testimony does not indicate the frequency of this. *See* ECF No. 20-6 at 95:1-17; 114:16-115:8.[6]

In sum, the only comments made with any degree of frequency are Godshall's comments that Ghafoor-Davis and her team were "too close" and unorganized and Alan Jennings's comments referring to Ghafoor-Davis as a radical. The record reflects that these comments were made "so much" or "all the time" or "a few times" or "many times." However, "[w]ith respect to the issue of pervasive conduct, courts in this Circuit have been steadfast in finding that 'general, unsubstantiated allegations that the alleged conduct occurred 'regularly' or 'all the time' are insufficient to survive summary judgment." *Joseph v. W. Penn Allegheny Health Sys., Inc*., No. CV 19-933, 2022 WL 889901, at *9 (W.D. Pa. Mar. 25, 2022) (quoting *Nitkin v. Main Line Health*, No. CV 20-4825-KSM, 2021 WL 4860742, at *11 (E.D. Pa. Oct. 18, 2021)).

---

[6]     Deja Wilson and Candace Moody indicate one specific instance in which Godshall rolled her eyes at them. *See* ECF No. 29-2 at 44:13-46:17; *see also* ECF No. 29 at 29:12-16.

As noted, to determine whether an environment is hostile, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Mandel*, 706 F.3d at 168 (quoting *Harris*, 510 U.S. at 23). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 788 (citations omitted). The evidence Ghafoor-Davis has adduced falls well short on this element. On the whole, the comments may be rude or pointed or make for "[a]n unpleasant work environment," but that does not make them actionable under Title VII, the PHRA or Section 1981. *Burgess v. Dollar Tree Stores, Inc.*, 642 F. App'x 152, 155 (3d Cir. 2016).[7]

Accordingly, because Ghafoor-Davis has failed to establish a genuine issue as to the severe or pervasive nature of any purported harassment, CALV is entitled to summary judgment on those claims.

### C.    Retaliation

CALV argues that it is entitled to summary judgment where Ghafoor-Davis cannot establish a prima facie case of retaliation. In particular, CALV argues that Ghafoor-Davis has not engaged in protected activity, and, to the extent she has, cannot causally connect that protected activity to any adverse employment action. The Court agrees.

---

[7]    The parties dedicate a substantial portion of their briefs addressing whether Jennings's statements are time barred or subject to the continuing violation doctrine. However, because the Court finds that the complained of conduct does not rise to a "severe or pervasive" level even with his conduct, it need not engage in a protracted statute of limitations analysis.

### 1.    Protected Activity

"[T]he anti-retaliation provision of Title VII protects those who . . . oppose discrimination made unlawful by Title VII." *Moore*, 461 F.3d at 341.  "Protected activity can include 'informal protests ... including making complaints to management,' but it 'must not be equivocal [or vague].'"  *Qin v. Vertex, Inc*., 100 F.4th 458, 476 (3d Cir. 2024) (quoting *Moore*, 461 F.3d at 341-43).  Ghafoor-Davis points to two potential protected activities.

The first concerns complaints Ghafoor-Davis made about Godshall to Fowlin, the Associate Executive Director of Human Resources.  These complaints started following Ghafoor-Davis's August 5, 2021, "writeup" by Godshall.  ECF No. 20-6 at 143:23-144:4; *see also* ECF No. 20-10.  Ghafoor-Davis complained about Godshall's actions and told Fowlin that she felt Godshall was undermining her program.  ECF No. 20-6 at 145:16-146:2; 155:19-158:25.  Ghafoor-Davis herself testified that she never told Fowlin that Godshall's actions were *because of* her race.  *Id*. at 145:16-146:2; 155:19-156:3.  Just the same, when Ghafoor-Davis brought her concerns to a board member, she did not complain about *racial* discrimination.  *Id.* at 148:18-149:13.

Accordingly, CALV argues that these complaints are not protected activity because they do not regard racial discrimination of the sort protected by Title VII.  *See Barber v. CSX Distribution Servs*., 68 F.3d 694, 701-02 (3d Cir. 1995) (reasoning that a letter in which the plaintiff complained about general unfair treatment and lack of promotion was not protected conduct where the letter did not specifically complain about age discrimination.)  Rather, Ghafoor-Davis only subjectively believes (a belief she never communicated) that Godshall's actions and behaviors concerned race because all of her "programs are all around race."  ECF No. 20-6 at 156:1-3.  Later, however, Ghafoor-Davis states that she complained to Fowlin about

Godshall's statement that she is more comfortable with white people than black people. *Id*. at 189:21-190:3.

The second protected activity Ghafoor-Davis references is the May 9, 2023, email complaint sent just days before she was fired. Therein, she complained about, *inter alia*, CALV cancelling a work trip to Cleveland citing budget concerns, a lack of transparency regarding COTL's budgetary footing, a lack of support for the COTL program, COTL's disconnect with the marketing team, the absence of a COTL-specific donation link on the website, and the general lack of appreciation for the work the CREJ team is doing. ECF No. 24-8.

However, again, nothing in this complaint regards *racial* discrimination. All of the things complained of in the May 9th email regard Godshall's attitude toward Ghafoor-Davis's *programs*, not her *race*. Ghafoor-Davis's own subjective belief that she was complaining about racial discrimination, *see* ECF No. 20-6 at 266:13-22, does not render her complaints protected activity because "[i]t is the objective message conveyed, not the subjective intent of the person sending the message, that is determinative." *Cacciola v. Work N Gear*, 23 F. Supp. 3d 518, 533 (E.D. Pa. 2014) (quoting *Curay–Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc*., 450 F.3d 130, 137 (3d Cir.2006)).

The Court finds that only Ghafoor-Davis's complaint to Fowlin that Godshall stated she was less comfortable around black people could be considered protected activity. However, Ghafoor-Davis has failed to adduce any evidence to suggest she was retaliated against for making that complaint.

### 2.     Causation

"A causal connection between the protected activity and the adverse action may be inferred from: (1) an unusually suggestive temporal proximity between the complaints of

discrimination and the adverse employment action; (2) an intervening pattern of antagonism following the protected conduct; or (3) the proffered evidence examined as a whole." *Archie v. City of Philadelphia*, No. CV 22-2915, 2025 WL 220024, at *8 (E.D. Pa. Jan. 16, 2025).  "[A]t the prima facie stage the plaintiff must produce evidence 'sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action.'"  *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017) (quoting *Kachmar v. SunGard Data Systems, Inc*., 109 F.3d 173, 177 (3d Cir. 1997)) (emphasis in original).

Ghafoor-Davis falls short of this burden for a number of reasons.  First, the timing of the complaint and the adverse actions militate against any reasonable inference of causation.  The complaint in which Ghafoor-Davis told Fowlin that Godshall stated she felt uncomfortable around black people appears to have occurred in the Fall of 2021.  Ghafoor-Davis testified that she raised this concern "early on in" Fowlin's employment with CALV.  ECF No. 20-16 at 193:11-17.  Fowlin started at CALV on September 27, 2021.  SUMF ¶ 27.  Thus, Ghafoor-Davis made this complaint to Fowlin roughly sixteen months prior to being placed on a PIP and eighteen months prior to her termination.  This is insufficient.  *See Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 221 (3d Cir. 2017) ("[a]n inference of 'unduly suggestive' temporal proximity begins to dissipate where there is a gap of three months or more between the protected activity and the adverse action.")

Second, Ghafoor-Davis has adduced no evidence Godshall was ever apprised of this complaint.  For Godshall to have placed Ghafoor-Davis on the PIP and then fired her for raising this complaint, Godshall would have to have known it occurred. *See Vermeer v. Univ. of Delaware*, 710 F. Supp. 3d 401, 420 (D. Del. 2024) ("[t]o show causation, there must be evidence that the decisionmaker knew of the protected activity.")  Ghafoor-Davis testified that

she made several complaints to Fowlin about Godshall starting shortly after the August 2021

Corrective Counseling memo. After one of these complaints, Godshall confronted Ghafoor-

Davis. ECF No. 20-6 at 156:4-15. However, after which complaint is altogether unclear.

Instead, Ghafoor-Davis's inference of causation rests on an intervening animus or pattern

of antagonism between her complaint and the PIP/termination. In particular, she reiterates the

exact same conduct which underlies her hostile working environment claim. While "intervening

animus" and "pattern of antagonism" are generally ill defined by the caselaw, courts generally

look to whether the conduct was "consistent and continuous," and whether there exists a basis for

inferring the conduct was linked to the protected activity. *Bartos v. MHM Corr. Servs., Inc.*, 454

F. App'x 74, 79 (3d Cir. 2011). For instance, did the antagonistic conduct begin shortly after the

protected activity? *See Robinson v. Se. Pennsylvania Transp. Auth., Red Arrow Div.*, 982 F.2d

892, 895 (3d Cir. 1993) (finding a pattern of antagonism where the intervening animus began

"soon after plaintiff's initial complaints and continued until his discharge.")

While the amorphous date of this protected activity hampers the causation analysis

somewhat, the record is clear that much of the complained of activity predates the complaint to

Fowlin. Further, for the same reasons the Court did not find the harassment "pervasive," the

Court finds that Ghafoor-Davis has not causally linked her Fall 2021 complaint about Godshall

to her 2023 adverse actions. As noted, the only comments made with any degree of frequency

are those criticizing Ghafoor-Davis's organization, the closeness of her team, and Jennings's

"unorganized radical" comments. However, Godshall's criticism of Ghafoor-Davis's

organization and time management dates back to the 2019 Corrective Counseling memorandum.

*See* ECF No. 20-8. Further, Ghafoor-Davis's testimony suggests that Jennings called her an

"unorganized radical" *prior* to leaving CALV in June of 2021. ECF No. 20-6 at 53:19-56:9.

Given the many months between Ghafoor-Davis's complaint and any adverse action, and in the absence of any continuous pattern of intervening animus, the Court holds that no reasonable juror could find that Ghafoor-Davis's Fall 2021 complaint was the *likely reason* for placing her on a PIP and ultimately firing her.  Accordingly, CALV is entitled to summary judgment on the claims for retaliation.

## V.    CONCLUSION

For the above noted reasons, the Court denies CALV's Motion for Summary Judgment on the claims of discrimination.  In all other respects, the Motion is granted.

An appropriate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge